**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 3, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BUCCANEER ENERGY (USA) INC.,

    Plaintiff - Appellant,

v.

GUNNISON ENERGY CORPORATION;
SG INTERESTS I, LTD.; SG INTERESTS
VII, LTD.,

    Defendants - Appellees.

No. 15-1396

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:12-CV-01618-RPM)**
_____

Ronald L. Wilcox, Wilcox Law Firm, LLC, Denver, Colorado, for Plaintiff-Appellant.

L. Poe Leggette (Mark S. Barron with him on the briefs), Baker & Hostetler LLP, Denver, Colorado, for Defendants-Appellees SG Interests I, Ltd. and SG Interests VII, Ltd.

Timothy R. Beyer (Peter J. Korneffel, Jr., with him on the brief), Bryan Cave LLP, Denver, Colorado, for Defendant-Appellee Gunnison Energy Corporation.
_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

# I.  INTRODUCTION

This antitrust case arises from a series of interactions among one incipient and two established natural gas producers in a portion of western Colorado known, at least in this litigation, as the Ragged Mountain Area. Buccaneer Energy (USA) Inc. ("Buccaneer") sued SG Interests I, Ltd., SG Interests VII, Ltd. (together, "SG"), and Gunnison Energy Corporation ("GEC") (collectively, "Defendants") after unsuccessfully seeking an agreement to transport natural gas on Defendants' jointly owned pipeline system at a price Buccaneer considered reasonable. Specifically, Buccaneer alleged that by refusing to provide reasonable access to the system, Defendants had conspired in restraint of trade and conspired to monopolize in violation of § 1 and § 2 of the Sherman Act, respectively. *See* 15 U.S.C. §§ 1–2.

The district court granted summary judgment to Defendants, concluding that Buccaneer could not establish either of its antitrust claims and that, in any event, Buccaneer lacked antitrust standing. We agree that Buccaneer failed to present sufficient evidence to create a genuine issue of fact on one or more elements of each of its claims, and we therefore affirm on that dispositive basis alone.[1]

---

[1] Accordingly, we need not, and so do not, reach Defendants' alternative arguments that Buccaneer's claims are barred by res judicata, the statute of limitations, and release.

## II.  BACKGROUND[2]

### A.  *Factual History*

The Ragged Mountain Area ("RM Area") is a section of oil- and gas-producing land located in Delta and Gunnison Counties, Colorado. The precise boundaries of the RM Area are unclear. At all times relevant to this case, natural gas produced in the RM Area was collected and transported to market through a gas-gathering system, processing facility, and six-inch diameter pipeline collectively referred to here as the Ragged Mountain Gathering System ("RM System"). The RM System carried this gas 20 miles to an interconnection on the Rocky Mountain Natural Gas Pipeline ("Rocky Mountain Pipeline"), a larger intrastate pipeline owned and operated by a regulated gas utility called SourceGas.

In 2000 or 2001, Defendants separately began acquiring mineral leases in the RM Area and competed with each other in doing so. They drilled wells on their lease properties and began producing gas. Before and during this time, Riviera Drilling and Exploration Company ("Riviera") also owned mineral leases in the RM Area, and gas produced from Riviera's wells was transported on the RM System. Riviera had eleven wells on its substantial leasehold acreage: eight that were producing and three that were considered proved but not producing. Two other entities—Petrox Resources, Inc.

---

[2] We include as background only the facts and procedural history relevant to the issues we address.

("Petrox") and WillSource Enterprise, LLC ("WillSource")—also held mineral leases in the RM Area.[3]

In June 2005, Defendants entered into an Area of Mutual Interest Agreement, granting each other an option to purchase a 50 percent interest in any leases or other mineral interests acquired by either party within an "Area of Mutual Interest" that encompassed certain "lands located in Delta, Mesa and Gunnison counties, Colorado." Defendants also granted each other the option to participate equally "in the planning, permitting, construction, operation and ownership" of any pipeline project initiated by the other party, including the Bull Mountain Pipeline, which SG had begun in 2003. The Bull Mountain Pipeline would be a 20-inch diameter pipeline that would travel 25.5 miles from the RM Area to an interconnection with the Questar interstate pipeline, rather than the intrastate Rocky Mountain Pipeline. GEC eventually exercised its option under the Area of Mutual Interest Agreement to participate equally with SG in constructing, operating, and owning the Bull Mountain Pipeline.

Also in June 2005, Defendants jointly acquired the RM System, plus some nearby mineral leases, from the RM System's former owner. Defendants entered into a Pipeline Operating Agreement, designating GEC as the operator of the RM System but giving ultimate control over pipeline operations to GEC and SG equally. As the operator, GEC

---

[3] Petrox purchased 5,750 leasehold acres in 2000. The extent of WillSource's holdings is not readily apparent, but the parties agree that WillSource owned leases during the relevant time period.

4

was authorized to negotiate transportation agreements with third parties, subject to SG's approval.[4]

In September 2005, GEC entered into a gas purchase agreement with Riviera, whereby GEC purchased gas from Riviera's wells at a price GEC received for reselling it, less $0.785 per MMBtu for transporting the gas through the RM System (in other words, Riviera paid the transportation rate only). Beginning in early 2006 and continuing into 2007, Defendants expressed and sporadically discussed a mutual interest in buying Riviera's holdings. On September 17, 2007, GEC informed Riviera that GEC was increasing the transportation rate in their purchase agreement from $0.785 per MMBtu to $1.52 per MMBtu and that it would be adjusting the rate quarterly through 2008. If Riviera did not agree to the new rate by October 1, 2007, Riviera's wells would be shut in on October 6, 2007. Riviera decided the new rate made its operation "uneconomic" and therefore did not agree to GEC's new terms. Its wells were then shut in.

Buccaneer was incorporated in February 2008 for the purpose of acquiring Riviera's leases in the RM Area. Tony Gale, a petroleum engineer and former vice president of oil and gas development at GEC, was appointed Buccaneer's president. In March 2008, Buccaneer and Riviera entered into a Lease and Purchase Agreement ("LPA"), whereby Buccaneer agreed to (1) pay $45,000 per month for 24 months in exchange for the right to operate and produce gas from Riviera's leases; (2) drill four new gas wells, contingent on its securing a reasonable transportation agreement for gas from

---

[4] Sometime later, GEC and SG each built a lateral gas-gathering pipeline off of the RM System—known as the Sheep Park Gas Lateral Pipeline and the Henderson gathering line, respectively. GEC and SG owned and operated these lines independently.

the new wells; and (3) use diligent efforts to obtain the transportation agreement, acquire rights of way, and lay pipeline to connect three wells to the RM System. The LPA also gave Buccaneer an option to purchase Riviera's leases, wells, and related assets within the 24-month period for $32 million.

Buccaneer immediately began pursuing a means for transporting its expected gas production. On March 3, 2008, Mr. Gale sent GEC a formal request for a transportation agreement on the RM System. Mr. Gale followed up on the request several times. He also contacted SG to express Buccaneer's interest in buying into, or securing a transportation agreement on, the Bull Mountain Pipeline, which was expected to be finished in 2009.

On June 30, 2008, GEC sent Buccaneer a draft transportation agreement that provided for a transportation rate of $1.52 per MMBtu for interruptible service. On July 12, 2008, Buccaneer returned a revised draft that kept GEC's rate but altered the interruptible-service provision such that GEC could interrupt service only if it could not gather Buccaneer's gas using commercially reasonable efforts, rather than at its sole discretion. Buccaneer also added language requiring GEC to comply with the common-carrier obligations of its pipeline operating permit and the Mineral Leasing Act of 1920. GEC responded with another draft on August 5, 2008, this time raising the transportation rate to $3.92 per MMBtu, reinserting the discretionary interruptible-service provision, and removing the common carrier provision. Buccaneer did not counteroffer again.[5]

---

[5] Evidence in the record shows that, throughout its course of dealing with Buccaneer, GEC was consulting with SG or otherwise keeping SG informed.

In September 2008, Buccaneer sent SG an offer to pay for 15 percent of the cost of constructing the Bull Mountain Pipeline in exchange for a 10 percent ownership interest. SG sent a counteroffer, indicating it would sell a 10 percent interest for 20 percent of the cost, but Buccaneer did not respond.[6]

From March to October 2008, Buccaneer used much of its investors' capital contributions and loans—which totaled $558,000—to make its monthly $45,000 lease payments to Riviera. All told, Buccaneer incurred over $1.2 million in start-up costs. Buccaneer's investors pulled out in late-fall 2008. At the time, Buccaneer had failed to secure a transportation agreement, the country was in the midst of an economic collapse, and natural gas prices had fallen dramatically in recent months. Buccaneer failed to make its November payment to Riviera, and on December 1, 2008, Riviera terminated the LPA. Buccaneer never produced gas from Riviera's leases.

Riviera filed its own lawsuit against Defendants on November 14, 2008, alleging antitrust and other claims. *See Riviera Drilling & Expl. Co. v. Gunnison Energy Corp.*, No. 08-cv-02486-REB-CBS, 2010 WL 582159, at *1 (D. Colo. Feb. 12, 2010) (unpublished). Buccaneer was not a party to that case. In February 2010, Riviera filed for Chapter 11 bankruptcy, and shortly thereafter, its lawsuit against Defendants was

---

[6] Petrox and WillSource each has its own history of transportation negotiations with Defendants. WillSource entered into an agreement on July 30, 2008, to transport gas on the RM System at a rate of $2 per MMBtu; however, WillSource never actually transported gas under that agreement. WillSource also reached an agreement to transport gas on the Bull Mountain Pipeline but has not transported gas under that agreement either. Petrox sought a transportation agreement on the RM System throughout the summer of 2013 but never entered into one. Instead, Petrox eventually secured an agreement to transport gas on the Bull Mountain Pipeline.

dismissed with prejudice for failure to prosecute. *Id.* at \*3–4.[7] As part of an April 2014

settlement agreement resolving an adversary proceeding connected to Riviera's

bankruptcy, GEC obtained all of Riviera's leasehold interests in the RM Area.

In July 2014, following years of post-construction disputes and delays, the Bull

Mountain Pipeline became fully operational. The RM System was decommissioned soon

thereafter.

### B. *Procedural History*

Buccaneer filed this case on June 21, 2012. Buccaneer asserted that the RM

System "was essential to effective competition for production rights and the sale of

natural gas from the Ragged Mountain Area" and claimed that, by refusing to provide

Buccaneer access to the RM System on reasonable terms, Defendants had engaged in a

conspiracy in restraint of trade and a conspiracy to monopolize in violation of § 1 and § 2

of the Sherman Act, respectively.[8]

Defendants separately moved for summary judgment before discovery was

complete, but the district court denied their motions. After discovery concluded,

Defendants again separately moved for summary judgment. Each argued, among other

things, that Buccaneer (1) lacked antitrust standing and (2) had not presented sufficient

evidence of a conspiracy or of harm to competition in a relevant antitrust market and thus

could not establish its antitrust claims.

---

[7] A panel of this court later affirmed the dismissal. *Riviera Drilling & Expl. Co. v. Gunnison Energy Corp.*, 412 F. App'x 89 (10th Cir. 2011) (unpublished).

[8] Buccaneer brought three additional claims—tortious interference with contract, and attempted monopolization and monopolization under § 2 of the Sherman Act—but those claims have since been dismissed or withdrawn and are not at issue on appeal.

Buccaneer filed separate responses in opposition to Defendants' motions and submitted with them several expert reports, including the joint report of Drs. Mark Dwyer and Michael Harris. This joint report corroborated Buccaneer's claims of concerted anticompetitive conduct and alleged two distinct harms to competition flowing from that conduct: harm to the market for upstream production rights and harm to the market for downstream sales of natural gas. Dr. Dwyer addressed the former, Dr. Harris the latter. Based on the contents of this report, Buccaneer maintained that it had, at the very least, demonstrated genuine issues of fact on both of its antitrust claims and thus was entitled to a trial. Buccaneer also argued it had antitrust standing, focusing principally on the question of its preparedness to begin gas production operations at the time it allegedly was excluded from the RM System.

After holding a hearing on the motions, the district court issued a written order granting summary judgment for Defendants on each of Buccaneer's antitrust claims. The district court first found that reasonable jurors could conclude Defendants conspired to deny Buccaneer reasonable access to the RM System and "intentionally blocked Buccaneer from entering into competition with them as producers of gas in the Ragged Mountain Area." Nonetheless, the court concluded Defendants were entitled to judgment "because Buccaneer lacks evidence showing that the defendants caused or were capable of causing injury to competition in a defined market, as opposed to simply harm to Buccaneer, and because Buccaneer has not established antitrust standing." The district court's latter conclusion was based primarily on its finding that Buccaneer, as a nascent

9

competitor, had not carried its burden of demonstrating preparedness to enter the market.

Buccaneer timely appealed. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## III. DISCUSSION

Buccaneer challenges both of the district court's alternative bases for granting summary judgment in Defendants' favor. First, Buccaneer argues the district court erred in concluding Buccaneer presented insufficient evidence of harm to competition in a relevant market, and for that reason, failed to establish its claims under § 1 and § 2 of the Sherman Act. To the contrary, Buccaneer asserts it did show harm to competition in a relevant market and that, with respect to its § 2 conspiracy claim, it was not required to make that showing. Second, Buccaneer argues the district court erred in concluding Buccaneer was not prepared to enter the market from which it allegedly was excluded and therefore lacked antitrust standing under § 4 of the Clayton Act. *See* 15 U.S.C. § 15.

Like Buccaneer (and the district court), we begin with the ultimate issue of whether Buccaneer can survive summary judgment on its antitrust claims. We review the district court's grant of summary judgment on these claims de novo. *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 984 (10th Cir. 2000). Addressing each of Buccaneer's claims in turn, we conclude Buccaneer failed to present sufficient evidence to survive summary judgment on either one of them, and we therefore affirm the district court's judgment on that basis.[9]

---

[9] In light of our conclusion on the merits, we need not and therefore do not address the separate issue of antitrust standing, which despite the name is not a jurisdictional requirement. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 416 n.5 (2004) (stating, after having rejected a § 2 claim on the merits, that it

## A. *Buccaneer's § 1 Claim*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Despite its semantic breadth, § 1 has long been construed to outlaw only concerted conduct by two or more separate entities that unreasonably restrains trade. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985) (citing *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)) (only unreasonable restraints); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767–68 (1984) (only multilateral conduct). Thus, a plaintiff asserting a claim under § 1 must prove not only the existence of an agreement or conspiracy between two or more competitors to restrain trade, but also that the restraint is unreasonable. *See Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1139 (10th Cir. 1997). Our focus here is limited to this latter requirement.[10]

There are "two main analytical approaches for determining whether a defendant's conduct unreasonably restrains trade: the per se rule and the rule of reason." *Gregory v.*

---

was "unnecessary to consider [defendant]'s alternative contention that [plaintiff] lacks antitrust standing"); 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 335f, at 89 (4th ed. 2014) ("When a court concludes that no violation [of the antitrust laws] has occurred, it has no occasion to consider [antitrust] standing."); *cf. Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 307 (3d Cir. 2011) ("[S]tatutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place."). For purposes of our analysis here, we assume Buccaneer has antitrust standing.

[10] Although Defendants argued below that Buccaneer could not prove an agreement or conspiracy to restrain trade, the district court found otherwise and Defendants do not challenge that determination here. We therefore assume the existence of an agreement and consider only whether that agreement restrained trade unreasonably. *See Nw. Wholesale*, 472 U.S. at 290 & n.4 (assuming existence of § 1 agreement where defendant did not challenge lower court's finding of one).

*Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1203 (10th Cir. 2006) (internal quotation marks omitted). The rule of reason is the default approach, and there is a presumption in favor of its application. *Id.* Under rule-of-reason analysis, courts seek to ascertain the extent to which challenged conduct harms competition and to then determine whether any such harm is nonetheless justified by countervailing procompetitive benefits. *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994). The per se rule, on the other hand, is reserved for "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Nw. Wholesale*, 472 U.S. at 289 (internal quotation marks omitted). Per se treatment "is appropriate only in 'relat[ion] to conduct that is manifestly anticompetitive.'" *Gregory*, 448 F.3d at 1203 (alteration in original) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977)). Absent a showing that per se treatment is warranted, "courts should apply a rule-of-reason analysis." *Nw. Wholesale*, 472 U.S. at 296–97.

Here, Buccaneer contends Defendants' agreement to deny it reasonable access to the RM System was a concerted refusal to deal that violated § 1 of the Sherman Act. Although concerted refusals to deal are among the types of agreements to which either the per se rule or the rule of reason may apply, depending on the circumstances of the case, *see Gregory*, 448 F.3d at 1203–04, Buccaneer does not specifically state by name which rule it sees as applicable here. But Buccaneer has not pursued a per se theory at the

12

summary judgment stage or on appeal,[11] and instead has advanced what is, not in name

but in substance, a fundamentally rule-of-reason argument. Thus, because Buccaneer

_____

[11] To be sure, the terms Buccaneer uses to describe Defendants' actions—i.e., "concerted refusal to deal" and "group boycott"—are labels the courts long have attached to conduct meriting per se invalidation under § 1 in certain circumstances. *See, e.g.*, *Nw. Wholesale*, 472 U.S. at 289 ("This Court has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act."). And Buccaneer's allegations—that Defendants conspired to deny Buccaneer reasonable access to the RM System and that the RM System is "essential" to Buccaneer's ability to compete—do track in part what *Northwest Wholesale* identified as the typical characteristics of forbidden group boycotts. *See id.* at 294 (explaining that the boycotts to which the Court has applied the per se rule "often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," among other things). But Buccaneer has failed to assert, let alone argue, that Defendants' conduct amounts to a per se violation of § 1. *Cf. Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 n.9 (3d Cir. 1996) ("Although Orson contended in the district court that Miramax's relationship with the Ritz was illegal per se, *and occasionally speaks of the relationship as a 'boycott,'* it does not contend in this appeal that the per se rule applies." (emphasis added)). Not once is the term "per se" used in Buccaneer's opening or reply brief; and the single reference to "per se" in Buccaneer's summary judgment filings appears in an explanatory parenthetical appended to a case citation.

And even if Buccaneer subjectively equated its group-boycott allegation to an allegation of per se illegality, we still would conclude that this oblique assertion does not suffice as the "threshold case" needed to justify application of the per se rule. *See Nw. Wholesale*, 472 U.S. at 298 ("A plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects."); *see also Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1550 (11th Cir. 1996) ("[T]he attachment of the group boycott label does not necessarily require as a consequence an application of the per se approach." (internal quotation marks omitted)). Although boycotts involving elements essential to competition may sometimes be per se illegal, the Supreme Court has clearly stated that application of the per se rule "must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *See State Oil Co. v. Khan*, 522 U.S. 3, 14 (1997) (internal quotation marks omitted); *cf. Levine*, 72 F.3d at 1550 ("The labeling of a restraint as a group boycott does not eliminate the necessity of determining whether it is a naked restraint of trade with no purpose except stifling competition." (internal quotation marks omitted)). Buccaneer has not attempted to make this threshold demonstration. Under these circumstances, we cannot conclude that application of the per se rule is warranted. *See Nw. Wholesale*, 472 U.S. at 298; *cf. Law v. NCAA*, 134 F.3d 1010, 1019

"does not contend that defendants' action was illegal per se, but instead advances an argument under the rule of reason," we confine our inquiry to the latter approach. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998); *see also, e.g.*, *Warrior Sports, Inc. v. NCAA*, 623 F.3d 281, 285–86 (6th Cir. 2010) ("Warrior's failure to challenge the rule as per se unlawful in proceedings below leaves it with only a rule-of-reason argument."); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002) ("Apani does not contend on appeal that CCE's actions were per se illegal. Thus, the rule of reason analysis [applies] to Apani's claim."); *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1172 n.5 (9th Cir. 1988) (similar); *Quality Mercury, Inc. v. Ford Motor Co.*, 542 F.2d 466, 469 n.2 (8th Cir. 1976) (similar); *but cf. Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 870 (9th Cir. 1991) (noting, in context of appeal from dismissal for failure to state a claim, that plaintiff "did not specify whether it based its [tying] claim on a per se theory or on a rule of reason theory," and considering whether a claim was stated under either theory).

Before turning to our analysis under the rule of reason, however, we pause briefly to address a set of arguments that fall outside the framework of that rule.

### 1. Arguments Concerning *Trinko* and the Essential Facilities Doctrine

Defendants have argued throughout this case that Buccaneer's allegations—i.e., that Defendants unreasonably denied it access to the RM System, which is "essential" to Buccaneer's ability to compete—boil down to a claim under the "essential facilities"

---

(10th Cir. 1998) ("[T]he Supreme Court has made it clear that the per se rule is a 'demanding' standard that should be applied only in clear cut cases.").

14

doctrine. *See generally City of Chanute v. Williams Nat. Gas Co.*, 955 F.2d 641, 647–49 (10th Cir. 1992) (discussing essential facilities doctrine), *overruled in part on other grounds by Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir. 1997). Defendants further assert that, because in their view Buccaneer cannot establish the elements of such a claim, *see Pittsburg Cty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 721 (10th Cir. 2004) (listing elements of essential facilities claim), the Supreme Court's decision in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP* (*Trinko*), 540 U.S. 398 (2004), dictates that they cannot be held liable for refusing to deal with Buccaneer.

Stated succinctly, Defendants' reasoning proceeds as follows: (1) Buccaneer's description of the RM System as "essential" is an invocation of the essential facilities doctrine; (2) the essential facilities doctrine applies to both § 1 and § 2 claims, and has the same elements under both; (3) *Trinko* recognizes the essential facilities doctrine as an exception to private businesses' presumptive right to refuse to deal with a competitor; (4) Buccaneer cannot establish the elements of a claim under the essential facilities doctrine; (5) Defendants therefore were free to reject Buccaneer's request for access to the RM system, unless another exception applies; (6) *Trinko* recognizes only one other exception, and it does not apply here; (7) thus, *Trinko* dictates that Defendants cannot be liable to Buccaneer under the antitrust laws; and finally, (8) Buccaneer's argument that *Trinko* does not apply to concerted conduct under § 1 is illogical because the essential facilities doctrine originated in the context of § 1 claims.

But the central premise on which this argument rests—that *Trinko* immunizes Defendants' conduct absent some exception—is false. At issue in *Trinko* was the question of whether a plaintiff could bring a § 2 monopolization or attempted monopolization claim against Verizon based on Verizon's alleged unilateral refusal to provide competitors reasonable access to its telephone service infrastructure. 540 U.S. at 402–05, 407. In concluding the plaintiff could not, the Supreme Court relied on the established notion that, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Id.* at 408 (alteration in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). While acknowledging that "the right to refuse to deal with other firms [is not] unqualified," *id.* (internal quotation marks omitted), the Court nonetheless concluded that the exceptions are limited and that Verizon's conduct in that case did not fall within one. *Id.* at 408–16.[12]

As Buccaneer has argued all along, however, this general right to refuse to deal with competitors applies only to single, not multiple, actors—to unilateral, not concerted action. *See generally Copperweld*, 467 U.S. at 761–77 (discussing at length the fundamental differences between the Sherman Act's treatment of unilateral conduct and

___

[12] We take issue with Defendants' characterization of *Trinko* as an essential facilities case. The Court merely acknowledged that the Second Circuit had relied on the doctrine in the underlying appeal and concluded that its decision "would be unchanged even if we considered to be established law the 'essential facilities' doctrine crafted by some lower courts." *Id.* at 410–11. The Court disclaimed ever having recognized the essential facilities doctrine and found "no need either to recognize it or to repudiate it" in that case. *Id.* at 411.

its treatment of concerted conduct). The *Trinko* Court acknowledged that distinction when it rejected the plaintiff's reliance on two early concerted-refusal-to-deal cases—*Associated Press v. United States*, 326 U.S. 1 (1945), and *United States v. Terminal Railroad Ass'n of St. Louis*, 224 U.S. 383 (1912)—because "[t]hese cases involved *concerted* action, which presents greater anticompetitive concerns." *Trinko*, 540 U.S. at 410 n.3. So, contrary to Defendants' insistence, *Trinko* simply does not speak to claims, like those here, alleging concerted refusals to deal.[13]

Having disposed of the *Trinko* issues,[14] we still are left with an assortment of competing arguments concerning the essential facilities doctrine. The parties' contentions on this point indirectly raise a legitimate question as to the doctrine's application in the context of § 1 claims.[15] But we need not reach that question here. Even assuming the

---

[13] Consistent with this conclusion, each of the five cases in which we have referenced *Trinko* involved § 2 claims alleging anticompetitive conduct by a single actor. *See SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827 (10th Cir. 2016); *JetAway Aviation, LLC v. Bd. of Cty. Comm'rs*, 754 F.3d 824 (10th Cir. 2014) (per curiam); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216 (10th Cir. 2009); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009).

[14] Buccaneer also argues that the district court erroneously relied on *Trinko*, but we conclude that this reliance, if erroneous, is immaterial. To the extent the district court applied *Trinko*'s "right to refuse to deal" rule, it did so in deeming lawful Defendants' alleged decision to exclude Buccaneer from the Bull Mountain Pipeline. But Defendants' actions toward Buccaneer vis-à-vis the Bull Mountain Pipeline are not at issue here. As Buccaneer concedes, its "claims [a]re based on Defendant's [sic] refusal to allow Buccaneer reasonable access to the Ragged Mountain Gathering System." Thus, exclusion from the *RM System*, *not the Bull Mountain Pipeline*, is the conduct that matters. And in addressing *that* conduct, the district court does not appear to have invoked *Trinko*. As a result, any alleged error by the district court in applying *Trinko* is inconsequential to Buccaneer's claims on appeal.

[15] For example, although the essential facilities doctrine is most often applied in the context of a claim under § 2, *see generally* 3B Phillip E. Areeda & Herbert

17

possibility of § 1 liability for a concerted-refusal-to-deal premised on the essential facilities doctrine, and assuming Buccaneer has correctly identified the contours of such a claim, we reject Buccaneer's claim on the record here. Buccaneer concedes that to prevail on such a claim, it must prove the second traditional element of the essential facilities doctrine: "a competitor's inability to duplicate the facility." *Pittsburg Cty.*, 358 F.3d at 721 (internal quotation marks omitted). And here, despite its strenuous arguments to the contrary, Buccaneer has plainly failed to do so. Buccaneer relies exclusively on evidence of the costs and other difficulties associated with constructing the Bull Mountain Pipeline; however, the relevant facility in this case is the significantly smaller RM System. While duplicating even the lesser RM System may have been difficult, we cannot conclude, in the absence of any evidence on the matter, that Buccaneer proved its inability to do so.

With these issues resolved, we turn now to the central question of whether Buccaneer has adequately established its § 1 claim under the rule of reason.

---

Hovenkamp, *Antitrust Law* ¶¶ 770–74, at 195–295 (4th ed. 2015); 13 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2221c–d, at 407–11 (3d ed. 2012); *see also, e.g.*, *Pittsburg Cty.*, 358 F.3d at 721; *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1519–21 (10th Cir. 1984), *aff'd* 472 U.S. 585 (1985), and although its elements are more consistent with § 2, *see Pittsburg Cty.*, 358 F.3d at 721 (listing the first element as "control of the essential facility by a *monopolist*" (emphasis added)), we have stated that the doctrine originated under § 1, *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 369 (10th Cir. 1988), *overruled in part on other grounds by Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir. 1997), and on one occasion have applied it in the context of a § 1 claim, *Gregory*, 448 F.3d at 1204.

## 2. Buccaneer Has Not Adequately Established Its Claim Under the Rule of Reason

The rule of reason calls for a holistic assessment of the parties' evidence aimed, ultimately, at discerning whether a challenged practice restrains trade unreasonably and so should be prohibited under § 1 of the Sherman Act. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). "Courts have imposed a consistent structure on [this] analysis by casting it in terms of shifting burdens of proof." *Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998). Thus, under the rule of reason:

> The plaintiff bears the initial burden of showing that an agreement had a substantially adverse effect on competition. If the plaintiff meets this burden, the burden shifts to the defendant to come forward with evidence of the procompetitive virtues of the alleged wrongful conduct. If the defendant is able to demonstrate procompetitive effects, the plaintiff then must prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner. Ultimately, if these steps are met, the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable.

*Gregory*, 448 F.3d at 1205 (quoting *Law*, 134 F.3d at 1019). To carry its initial burden, a plaintiff "cannot simply show that the challenged action adversely affected [its] business." *Id.* Instead, because the antitrust laws are concerned with effects on consumers rather than competitors, the plaintiff must show "an adverse effect on competition in general." *Id.*; *see also SCFC ILC*, 36 F.3d at 963 ("[A] practice ultimately judged anticompetitive is one which harms competition, not a particular competitor.").

There are several ways to establish that an alleged restraint has or is likely to have a significant anticompetitive effect. *See Law*, 134 F.3d at 1019; *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 966, 968 & n.24 (10th Cir. 1990). First, under

19

an abbreviated, "quick look" rule-of-reason analysis, courts sometimes simply assume the existence of anticompetitive effect where the conduct at issue amounts to a "naked" and effective restraint on price or output that carries "obvious" anticompetitive consequences.[16] *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 769–70 (1999); *Law*, 134 F.3d at 1019–20. Under quick-look analysis, the burden in effect immediately shifts to the defendant to demonstrate countervailing procompetitive effects. *See N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 362 (5th Cir. 2008) (citing *Cal. Dental*, 526 U.S. at 775 n.12). Second, a plaintiff may directly establish anticompetitive effect by showing, for example, that the defendant has actually reduced output or raised prices. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *Law*, 134 F.3d at 1019. And third, a plaintiff may attempt to indirectly establish anticompetitive effect "by defining a relevant product and geographic market" and showing the defendant possesses market power in that market. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) (addressing § 2 claim); *cf. SCFC ILC*, 36 F.3d at 965–66 (assessing market power as indirect proof of anticompetitive effect under § 1 rule-of-reason inquiry and noting similarities between § 1 and § 2 market-power analyses).

---

[16] Although the Supreme Court traditionally has framed quick-look analysis as one of the several possible methods for applying the rule of reason, *see, e.g.*, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010) (stating that the rule of reason "may not require a detailed analysis; it can sometimes be applied in the twinkling of an eye," which is language used synonymously with "quick look" (internal quotation marks omitted)), it occasionally has spoken of quick-look analysis and rule-of-reason analysis as distinct concepts, *see, e.g.*, *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013). While we are not convinced the latter instances signal a departure from the traditional framing, even if they do, it would not affect the outcome of our analysis here.

In its opening brief, Buccaneer begins its analysis by referencing each of these three methods and claims it sufficiently established that Defendants' conduct harmed competition in two separate spheres: the market for upstream production rights, and the market for downstream gas sales. But Buccaneer has failed to meet its burden under any of these methods.

As an initial matter, the quick-look method can easily be dismissed. Although Buccaneer references quick-look analysis as one way in which harm to competition can be established, it does not rely on or further analyze this method in its argument. This implicit forfeiture makes sense, given that the market effects of Buccaneer's inability to access the RM System are far from "obvious." *See Cal. Dental Ass'n*, 526 U.S. at 771. Indeed, as we discuss in more detail below, there is no evidence of *any* effect on either of the "markets" Buccaneer has identified, let alone an anticompetitive one. This case therefore stands in stark contrast to the only case in which this court has found a quick-look analysis appropriate: where a horizontal price-fixing agreement patently aimed at reducing the salaries paid to college basketball coaches *actually succeeded in reducing salaries*. *Law*, 134 F.3d at 1019–20. By contrast, Defendants' conduct here "might plausibly be thought to have . . . no effect at all on competition," thus rendering quick-look analysis inappropriate. *See Cal. Dental Ass'n*, 526 U.S at 771; *cf. Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 387 (8th Cir. 2007) (describing quick-

look analysis as "exceptional" and "reserved for the most patently anticompetitive restraints").[17]

Next, we can just as quickly reject Buccaneer's claim that it presented direct evidence of actual anticompetitive effects. As for the supposed production rights market, and assuming for the moment that this is a legally sufficient antitrust market, Buccaneer has not presented any evidence that fewer production rights have been acquired in the RM Area or that Defendants' alleged monopsonist position has allowed them to pay less-than-competitive prices for such rights. Similarly, as for the gas-sales market, Buccaneer has shown neither an actual increase in the price SourceGas paid for natural gas nor an actual reduction in the amount of natural gas sold. To the contrary, Buccaneer's own expert report shows that gas output through the RM System actually increased in the years following Buccaneer's exclusion in 2008. Thus, Buccaneer has not directly established the requisite harm to competition. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (rejecting plaintiff's claim that defendants' concerted refusal to deal had actual anticompetitive effects where plaintiff "failed to

_____

[17] Furthermore, we agree with our Sixth Circuit colleagues' reasoning in *Worldwide Baseball & Sport Tours, Inc. v. NCAA*, that quick-look analysis is generally unsuited for cases in which the relevant market is "neither obvious nor undisputed." 388 F.3d 955, 961 (6th Cir. 2004); *see also id.* ("Far from being a case in which 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on *consumers* and *markets*,' [*Cal. Dental Ass'n*, 526 U.S. at 770] (emphasis added), here the relevant market is not readily apparent and the Plaintiffs have failed to adequately define a relevant market, thereby making it impossible to assess the effect of [the challenged practice] on customers rather than merely on competitors."). As we explain below, this is precisely such a case.

support with any evidence his conclusory assertion that the defendants' behavior actually had the effect of restricting competition").

That leaves us to consider whether Buccaneer has indirectly shown harm to competition by establishing that Defendants "possess[] market power in the relevant market where the alleged anticompetitive activity occurs." *SCFC ILC*, 36 F.3d at 965. Before a plaintiff can demonstrate market power, it must satisfy its burden of identifying a relevant market in terms of both product and geographic area. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement." (internal quotation marks omitted)). The product market consists of products "found to be sufficiently substitutable," and the geographic market encompasses "the terrain in which competition takes place." *Novell*, 731 F.3d at 1071. Once a legally sufficient market has been identified, the plaintiff must then show market power, which entails demonstrating that the defendant has "*either* power to control prices *or* the power to exclude competition." *Reazin*, 899 F.2d at 966 (internal quotation marks omitted). This the plaintiff can do by "pointing to the defendant's share of [the relevant] market and perhaps barriers to entry." *See Novell*, 731 F.3d at 1071.

Applying this framework here, we assess Buccaneer's proposed markets separately.

### a. *Market for Upstream Production Rights*

#### i. The Relevant Market

Buccaneer asserts that, within its so-called market for upstream production rights, the relevant product is "production rights" and the relevant geographic area is the RM Area. We conclude Buccaneer has not adequately defined either one.

#### 1) Product Market

The relevant product market in any given case "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *SCFC ILC*, 36 F.3d at 966 (internal quotation marks omitted). A plaintiff cannot arbitrarily choose the product market relevant to its claims; instead, the plaintiff must justify any proposed market by defining it "with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Campfield*, 532 F.3d at 1118 (internal quotation marks omitted). Interchangeability and cross-elasticity are "substantially synonymous." *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002). If two products share a high cross-elasticity of demand—in that an increase in the price of one product causes consumers to switch to the other, and vice versa—then those products likely are interchangeable and may properly be considered part of the same product market. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1120 (10th Cir. 2014).

Here, Buccaneer has never clearly defined "production rights," and Defendants assert the term has no uniform meaning. Buccaneer's expert, Dr. Dwyer, similarly failed to define "production rights" in the joint expert report and could not provide a clear

24

definition when asked to do so at his deposition. Neither could Buccaneer's CEO, Tony Gale. Indeed, Mr. Gale thought the term might include "[1] a working interest or [2] a net-revenue interest, possibly [3] a net profits or [4] an override interest, [5] an option to buy. [6] Anything that would give you the right to produce that well. [7] A lease. You know, [8] fee ownership of minerals I would think would be a production right." The district court, despite its efforts, was able to discern no meaningful definition other than "mineral leases (or mineral interests) that provide the right to extract gas production."

In its brief, Buccaneer focuses exclusively on the district court's decision to divide production rights into two separate markets—one for new leases, one for existing leases—and argues this segregation was erroneous. But Buccaneer *still* does not offer its own definition of the product market for production rights. Regardless of any potential error on the district court's part in its bifurcated treatment of new and existing leases, the fact remains that Buccaneer bore the burden of defining a product market in terms of reasonable interchangeability and cross-elasticity of demand. *Lenox*, 762 F.3d at 1120. Buccaneer plainly understands this burden, as the central thrust of its argument is that the *district court's* definition cannot stand because *it* was not explained in those terms. Critically, however, Buccaneer does not argue new and existing leases *are* substitute products or conduct its own cross-elasticity analysis to demonstrate the district court's approach is wrong. It merely asserts the court's definition was inadequately supported and thus cannot stand. But this issue was for Buccaneer to resolve in the first instance, and the district court's independent foray into market definition does not absolve Buccaneer of that burden. *See Campfield*, 532 F.3d at 1118. And the cases Buccaneer

25

relies upon, in which this court reversed trial courts' market definitions as inadequately supported by interchangeability and cross-elasticity principles, do not suggest otherwise. *See Telecor*, 305 F.3d at 1131–32; *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1221 (10th Cir. 1986). In fact, *Telecor* squarely cuts against Buccaneer's position. *See* 305 F.3d at 1131–32 (holding district court erred in granting summary judgment for plaintiff as to scope of relevant product market because *plaintiff* had not alleged sufficient facts to satisfy its burden of showing products were interchangeable).

Finally, even if we could infer from the record that Buccaneer considers all leases to be "production rights," there is still the question of whether "mineral interests" (presumably, fee ownership of minerals) are also included, to say nothing of the multifarious other items Mr. Gale listed in his deposition testimony. By arguing only that the district court's definition is *wrong*, but never offering a definition it considers to be *right*, Buccaneer left that question open and, as a result, impermissibly shirked its "obligat[ion] to make an affirmative showing of [its] proposed relevant market." *Telecor*, 305 F.3d at 1131.

2) Geographic Market

We also conclude that Buccaneer failed to adequately establish the relevant geographic market. "The geographic market is the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Westman*, 796 F.2d at 1222 (ellipsis and internal quotation marks omitted). Buccaneer asserts the RM Area is the relevant geographic market; but as

26

the district court noted, "[t]he Ragged Mountain Area has not been defined geographically with any precision."

In Buccaneer's initial complaint, the RM Area was "the Ragged Mountain Field and adjacent areas in Delta and Gunnison Counties, Colorado"; in its amended complaint, the RM Area was "that area encompassed within Townships 10 South to 12 South and Ranges 89 West to 91 West"; at the hearing below, the RM Area was "essentially Gunnison County and part of Delta County, Colorado"; and in its reply brief, the RM Area is an area that "coincide[s] with the area served by Defendants' pipelines." Although the record contains a map entitled "Ragged Mountain Area," it does not include any semblance of a geographic boundary line. Rather, it simply depicts the relative locations of the RM System, the Bull Mountain Pipeline and its gathering system, and several other gathering systems. But the record demonstrates that producers in the area construct connector lines from their wells to these gathering systems in order to transport gas; so, arguably the geographic "production rights" market could include all of the surrounding land on which viable "production rights" exist and from which gas wells reasonably could be interconnected to the RM System. Neither the map nor any other evidence cited by Buccaneer even loosely specifies the outer boundaries of such land.

In short, even if Buccaneer had established a relevant product market for "production rights," it failed to adequately define the RM Area and thus failed to carry its burden of establishing the relevant geographic market for such production rights. *See SCFC ILC*, 36 F.3d at 966. Buccaneer offered no definition of the RM Area in its opening brief and, in its reply brief, merely asserted that the RM Area "coincided with

27

the area served by Defendants' pipelines"—the larger of which, as noted already, is not relevant to Buccaneer's claims—and pointed to a map from which no boundaries can be discerned. This does not suffice.

Because Buccaneer failed to establish the product and geographic boundaries of its supposed upstream market for production rights, the district court did not err in granting summary judgment for Defendants on Buccaneer's § 1 claim to the extent that claim was based on harm to competition for production rights. *See Campfield*, 532 F.3d at 1118 ("Failure to allege a legally sufficient market is cause for dismissal of the claim.").

ii. Market Power

Moreover, even if Buccaneer had established a relevant market for upstream production rights in the RM Area, it has not shown Defendants possessed market power there.

To properly frame our inquiry, it is important to note initially that the harm Buccaneer alleges in this market implicates a monopsony scenario. As we have explained,

> A monopsony is different from the usual form of monopolistic control in which suppliers utilize market power to restrict output and thereby raise prices. In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices. Monopsonistic practices by buyers are included within the practices prohibited by the Sherman Act. When considering market power in a monopsony situation, the market is not the market of competing sellers but of competing buyers.

*Campfield*, 532 F.3d at 1118 (citations and internal quotation marks omitted). The same general framework for assessing market power applies to monopsony and monopoly situations alike. *See Todd v. Exxon Corp.*, 275 F.3d 191, 199–201, 206–08 (2d Cir. 2001);

28

*see also Telecor*, 305 F.3d at 1134–35 (discussing *Todd* favorably). Here, Buccaneer alleges Defendants' restraint on transportation allows them to exercise monopsonistic power in the market for production rights—that is, reduce the number of competing buyers of production rights to such a level that Defendants can insist on less-than-competitive prices when purchasing such rights. Thus, the market in which Defendants allegedly exercise market power is the market of competing buyers of production rights. *See Campfield*, 532 F.3d at 1118.

"To demonstrate 'market power,' a plaintiff may show evidence of *either* 'power to control prices' *or* 'the power to exclude competition.'" *Reazin*, 899 F.2d at 966 (quoting *Westman*, 796 F.2d at 1225 n.3). "Power over price and power over competition may, in turn, depend on various market characteristics . . . ." *Id.* at 967. As a result, appraising market power typically necessitates an examination of market share, barriers to entry, the number of competitors in the market, market trends, and other relevant considerations. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 894 (10th Cir. 1991). Of these pertinent factors, market share—i.e., percentage of the relevant market—is a focal point. *See id.* Although we have long recognized that "market share *alone* is insufficient to establish market power," *Bright v. Moss Ambulance Serv., Inc.*, 824 F.2d 819, 824 (10th Cir. 1987) (emphasis added), we have also noted that "it must be shown how much of the relevant market a defendant controls if market power is to be evaluated," *Bacchus*, 939 F.2d at 894 (citation omitted), and that "the absence of market share may give rise to a presumption that market power does not exist," *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1282 (10th Cir. 2012).

29

Applying these considerations here, it is evident Buccaneer has not presented evidence from which a jury could find that Defendants possessed market power in the market for production rights. First and foremost, Buccaneer did not demonstrate Defendants' market share. Although Buccaneer asserts that "Defendants achieved a significant concentration of production rights in the Ragged Mountain Area, and no other producer permanently entered the market for production rights in the Area since Defendants acquired the Ragged Mountain Gathering System," it neither expresses Defendants' alleged "significant concentration" as a percentage of the market, nor, for that matter, supports this assertion with any relevant evidence. Buccaneer's expert based its conclusion that Defendants dominate the market for production rights on statistical evidence showing that, from 2008 to 2013, Defendants' wells accounted for almost all of the natural gas production in Gunnison County. This may be true, and it may even be the result of some underlying competitive defect. At bottom, however, Defendants' share of *production* tells us nothing definitive about Defendants' share of production *rights*.

As far as the market for the latter product is concerned, Buccaneer presented no evidence from which Defendants' market share reasonably can be discerned. Buccaneer failed to investigate the purchase and sale of leases in the RM Area—not to mention other mineral interests—since Defendants took over the RM System in 2005, and thus painted no picture of the relevant players in the market for purchasing production rights. There is no evidence, for example, of the total number of production rights in the RM Area or Defendants' proportionate share of them; nor is there evidence showing the number of production rights put on the market since Defendants took over the RM

30

System and the percentage of those rights that were purchased by Defendants. In fact, the evidence shows that other entities competed with, and even twice outbid, Defendants in the purchase of lease rights in 2010. It may very well be, as Buccaneer claims, that Defendants' evidence of "[o]ne entrant to a market fails to establish lack of injury to competition." But, under the first prong of the rule of reason, Defendants were not responsible for showing a "lack of injury"; rather, Buccaneer was responsible for showing the presence of it. *Reazin*, 899 F.2d at 960. Simply put, Buccaneer did not adequately examine the market in which it asserts Defendants harmed competition and therefore cannot establish Defendants' share of that market.

Moreover, Buccaneer did not present evidence on "the number and strength of other competitors" in the market for purchasing production rights in the RM Area. *Bacchus*, 939 F.2d at 894. Nor did it reference pertinent evidence of "market trends." *Id.* And the question of whether it established the existence of barriers to entry is debatable. On the one hand, it arguably can be inferred that Defendants' alleged refusal to share the only transportation infrastructure in the RM Area presented a significant barrier to entry into the market for production rights. Buccaneer set forth evidence of the high cost, numerous regulatory permits and approvals, and delays involved in building a separate pipeline system. While these facts related to the larger Bull Mountain Pipeline, rather than the RM System, they likely support an inference that a new entrant would face an entry barrier consisting of the cost of constructing a viable transportation system of its own. And Buccaneer is correct that in *this* context, the fact that Defendants were outbid

in 2010 is not necessarily significant. *See Lenox*, 762 F.3d at 1125 ("A single competitor's breakthrough does not preclude a finding of significant barriers to entry.")

But on the other hand, casting the need to build a pipeline system as a barrier to entry assumes that a lack of transportation would keep companies from buying production rights in the RM Area. While that assumption may make sense in theory, it is by no means guaranteed in reality. It is possible, for instance, that a company might compete to purchase such production rights, intending to defer any decision on pipeline-construction and actual production until it could properly evaluate the reserves covered by the rights, the company's other capital needs, market conditions, and myriad other factors that weigh on whether and when to move forward with production. And while evidence that only one firm entered the production rights market might weigh against this possibility, *see id.*, that is not what we have here. Although *Defendants* pointed to only one example of entry, *Buccaneer* did not show there were no others, and it was Buccaneer that bore the burden of proof. Without some evidence of transactions for production rights on a market-wide basis, it is not possible to meaningfully assess whether other companies' lack of transportation infrastructure should be considered a barrier to entry into the production rights market. And in any event, even assuming Buccaneer established significant barriers to entry, Buccaneer cites no case (and we have not found one) in which a court found sufficient market power on the basis of barriers alone.

For these reasons, we conclude that Buccaneer failed to carry its burden of demonstrating market power and therefore also failed to establish anticompetitive effect

32

in the alleged market for production rights. *See SCFC ILC*, 36 F.3d at 965. It follows that, at least to the extent Buccaneer's § 1 claim was predicated on harm to competition in the market for production rights, the district court did not err in granting summary judgment for Defendants.

We now apply this same analytical framework to assess Buccaneer's additional allegation of harm to competition in the market for downstream gas sales.

b. *Market for Downstream Gas Sales*

i. <u>The Relevant Market</u>

The relevant product here—natural gas—is straightforward and undisputed. But Buccaneer's proposed geographic market is byzantine and contested. The district court devoted little time to the issue of anticompetitive effect in the market for gas sales and appears to have assumed the relevant geographic market was the Rocky Mountain Natural Gas Pipeline ("Rocky Mountain Pipeline") generally. Buccaneer, for its part, simply characterizes the relevant market as "the market for downstream sales of gas" and does not specifically address the contours of that market in terms of the considerations relevant to rule-of-reason analysis.

Treating the Rocky Mountain Pipeline as the relevant geographic market seems logical enough, as it was the pipeline to which the RM System was connected and the place where gas from the RM System was sold. But that is not how Buccaneer's expert, Dr. Harris, chose to define it. Rather, Dr. Harris's portion of the joint report—and, importantly, the market-share figure Buccaneer derives from it—was based on a substantially narrower definition of the relevant market. Dr. Harris's market definition is

33

limited in place to a comparatively small segment of the Rocky Mountain Pipeline, and in time to "peak" winter periods when capacity on the Rocky Mountain Pipeline is constrained. Defendants take issue with this narrow definition, alleging various lapses in Dr. Harris's analysis and characterizing "peak periods" as "undefined."

To be sure, the evidence suggests the gas-sales market on the Rocky Mountain Pipeline differed between on-peak (constrained) conditions and off-peak (unconstrained) conditions. It is undisputed that, in off-peak conditions, gas from the RM System competed with gas from numerous other sellers throughout the Rocky Mountain Pipeline and even in broader interstate markets. But Buccaneer's evidence shows that during on-peak conditions, RM System gas was captive to a relatively small stretch of the Rocky Mountain Pipeline located between the Collbran compressor station (to the west of the RM System input) and the Crystal River compressor station (to the east of the RM System input). This captivity occurred because capacity constraints forced gas to flow only from west to east from the Collbran station, meaning that RM System gas necessarily flowed east and could serve only two specific demand areas. The evidence further indicates that SourceGas, the dominant gas purchaser on the Rocky Mountain Pipeline, was unable to meet its peak demand in these two areas using gas from the Collbran station and the nearby Wolf Creek storage facility (which was the only storage facility able to serve this confined segment during peak periods), and that from 2006 to 2014, RM System gas supplied 14–31 percent of that peak demand. And while Defendants claim Buccaneer has not defined the "peak period," Dr. Harris testified it is the winter, specifically December through February and "perhaps" March.

34

But focusing on this narrow glimpse of the market is inadequate. First, a "constrained Rocky Mountain Pipeline" and an "unconstrained Rocky Mountain Pipeline" do not represent two separate "geographic markets" for the sale of gas transported through the RM System. The Rocky Mountain Pipeline is a single immovable structure, and RM System gas was sold there year-round through one interconnection—in other words, the same product was transported to the same place at all times. Moreover, Buccaneer admits that, during most of the year (i.e., off-peak periods), the Rocky Mountain Pipeline was unconstrained and gas from the RM System competed pipeline-wide. Buccaneer cites no legal (or other) authority to support the notion that a fragment of a geographic market can amount to a distinct geographic market in the presence of certain ephemeral (if recurrent) economic conditions, much less authority that supports focusing on that narrower market to the exclusion of the broader, prevailing market. To the contrary, authority from another federal circuit suggests the relevant geographic market is the market in which a defendant most often operates. *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 599 (8th Cir. 2009) ("An antitrust plaintiff must allege a geographic market in which the defendant supplier draws a sufficiently large percentage of its business. This . . . prevent[s] antitrust plaintiffs from delineating arbitrarily narrow geographic markets.").

Although we disapprove of Dr. Harris's artificially narrow market definition, we would reject Buccaneer's claim of competitive harm to the downstream market in any event. That is, even if we accept Dr. Harris's constrained segment as the relevant geographic market for downstream gas sales, we nevertheless conclude Buccaneer did

not set forth facts from which a jury could find that Defendants possessed market power in that market.

ii.  Market Power

Buccaneer's only evidence of market power in the narrowly-defined constrained market is market share. As noted already, however, "*market share alone is insufficient to establish market power*." *Bacchus*, 939 F.2d at 894 (emphasis added) (citation omitted). Buccaneer points to no evidence concerning the other considerations relevant to market power—for example, barriers to entry and other competitors. *Id.* And Dr. Harris did not discuss these other considerations in the joint expert report. Buccaneer presented no evidence of the difficulties (or lack thereof) that other gas producers would have faced in interconnecting with the supposedly relevant segment of the Rocky Mountain Pipeline or otherwise getting gas to the two demand areas Defendants allegedly supplied during the peak winter months. Nor did Buccaneer actually assert (let alone substantiate) that no other gas sellers operated in that segment. It was Buccaneer's burden to present evidence on these points. *Reazin*, 899 F.2d at 966–67.

Furthermore, Buccaneer (and Dr. Harris) failed to address the issue of market-power durability. *See Lenox*, 762 F.3d at 1124; *Reazin*, 899 F.2d at 968 ("[M]arket power, to be meaningful for antitrust purposes, must be durable."). Here, Defendants were captive to SourceGas in a constrained market. Although this is likely not enough to conclusively establish Defendants had *no* control over the price at which they sold their gas, it significantly diminishes the possibility that they could maintain market power even

were it initially obtained. If Defendants raised their prices and SourceGas balked, Defendants had nowhere else to turn.

Finally, Buccaneer's market-share figure is itself questionable. Dr. Harris arrived at his 14–31 percent calculation by combining GEC's and SG's gas sales and thus necessarily assumed that these entities do not compete in the market for downstream gas sales. But Dr. Harris offered no justification for that critical assumption, and Defendants' evidence suggests it is invalid. Under these circumstances, it is likely that each defendant's share of the constrained market actually was significantly less than the 14–31 percent indicated by Dr. Harris and that Defendants competed with each other on price.

For these reasons, even if Buccaneer had adequately established the relevant market for downstream gas sales, it did not carry its burden of showing Defendants possessed market power in that market. Buccaneer therefore cannot satisfy its related burden of demonstrating significant anticompetitive effect under the rule of reason, and the district court did not err in granting summary judgment in Defendants' favor. In light of this disposition, Buccaneer's remaining arguments are irrelevant and we do not address them.[18]

---

[18] Buccaneer contends, for example, that Defendants mischaracterize our precedent discussing the minimum market-share percentage necessary to establish market power and that, contrary to the district court's conclusion, there is a disputed issue of material fact as to whether Defendants were "price takers" in the market for downstream gas sales and for that reason lacked any ability to raise gas prices. Even if we agreed on both points, it would not change our conclusion that Buccaneer failed to carry its burden of coming forward with evidence from which a jury could find Defendants possessed market power in the gas-sales market.

In summary, to satisfy its initial burden of showing anticompetitive effect under the rule of reason, Buccaneer needed to establish that Defendants possessed market power in a relevant market. Buccaneer failed to carry that subsidiary burden with respect to both of its asserted anticompetitive effects. First, it failed to adequately identify the product market and geographic market for upstream production rights. And without that definition, it is impossible to determine whether Defendants possessed the requisite market power. Second, Buccaneer has inappropriately narrowed the geographic market for downstream gas sales to a three-to-four-month period in a small segment of the Rocky Mountain Pipeline under capacity constraints. It also has made no effort to identify barriers to entry into that market or to discuss any other market-power-related considerations besides market share, and it has assumed without evidentiary support that GEC and SG do not compete with each other for gas sales. Accordingly, Buccaneer has not presented facts from which a jury could find harm to competition in a defined market and therefore has not established its § 1 claim. The district court's disposal of that claim on summary judgment was proper.

### B.   *Buccaneer's § 2 Conspiracy Claim*

Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. We clarified recently in *Auraria Student Housing at the Regency, LLC v. Campus Village Apartments, LLC* that a claim of conspiracy to monopolize under § 2, like a claim under § 1, requires proof of a relevant antitrust market. 843 F.3d 1225, 1232–33 (10th Cir. 2016). As the

foregoing discussion demonstrates, Buccaneer has not adequately established a relevant market in this case. Buccaneer's § 2 conspiracy claim therefore fails for the same reasons as its § 1 claim. *See id.*; *see also Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008) ("By failing to allege an appropriate market, [the plaintiff] has failed to state a claim under § 2 of the Sherman Act.").

## IV. CONCLUSION

Because Buccaneer did not present evidence from which a jury could conclude that Defendants' conduct actually or potentially harmed competition in a relevant antitrust market, Buccaneer's claims under § 1 and § 2 of the Sherman Act must fail. Accordingly, we AFFIRM the district court's order granting summary judgment in favor of Defendants on that basis.